AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
District of Kansas

FILED
U.S. District Court
District of Kansas
1/28/22
Clerk, U.S. District Court
By AA Deputy Clerk

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

the premises and devices located at 434 West E Avenue, Kingman, Kansas as further described in Attachment A

Case No. 22-6012-GEB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ________ District of Kansas, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. 2252A | Offenses relating to the Possession/Receipt/Distribution of Child Pornography |
| 18 U.S.C. 922(g)(1) | Felon in Possession of Firearm/Ammunition |

The application is based on these facts:

See Attached Affidavit of Probable Cause.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: __________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Travis Putrah, SA, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/28/2022

[signature]
*Judge's signature*

City and state: Wichita, KS

The Honorable Gwynne E. Birzer
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

Your affiant, Travis Putrah, being duly sworn, hereby deposes and states the following:

**INTRODUCTION AND AGENT BACKGROUND**

1. Your affiant is a Special Agent with Homeland Security Investigations ("HSI") and has been so employed since September 2019.

a. As a requirement for employment as an HSI Special Agent, your affiant successfully completed a twelve-week Criminal Investigator Training Program ("CITP") located at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. At the conclusion of CITP, your affiant also completed an additional twelve-week HSI Special Agent Training ("HSISAT") Academy. As part of the training at FLETC, your affiant received extensive instruction in the areas of Customs law, Immigration law and Criminal law.

b. Prior to your affiant's tenure as a SA with HSI, your affiant was employed as a Border Patrol Agent with the Department of Homeland Security ("DHS") from 2005 to 2019. From 2015 to 2018, your affiant was assigned to the Federal Bureau of Investigations' ("FBI") Indian Country Task Force in Bemidji, Minnesota. Your affiants' duties included investigating crimes of violence, to include death and assaults with deadly weapons; sexual assaults of juveniles, human trafficking, illegal trafficking of firearms and explosives; the manufacture, sale, and distribution of controlled substances; trafficking of child pornography; money laundering; arson; and the disruption/dismantling of violent gangs.

c. From 2018 to September 2019, your affiant was assigned to the HSI Task Force in Wichita, Kansas. While serving as an HSI TFO, your affiant was responsible for investigating federal violations of the trafficking of controlled substances; the production and sale of fraudulent documents; violations of immigration law; the trafficking of child pornography; and the theft of intellectual property.

**PURPOSE OF THE AFFIDAVIT**

2. This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the locations specifically described in Attachment A of this Affidavit, including the entire property located at **434 West E Avenue, Kingman, Kansas** (referenced herein as "**SUBJECT PREMISES**"), including the content of electronic storage devices located therein, for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A and § 922(g)(1), which items are more

specifically described in Attachment B of this Affidavit.

3. The statements in this Affidavit are based in part on information provided by the National Center for Missing and Exploited Children ("NCMEC"), Oath Holdings, Cox Communications, other law enforcement officers and on my investigation of this matter. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, your affiant has not included each and every fact known to me concerning this investigation. Your affiant has set forth only the facts that they believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A(a)(1) (transportation of child pornography); 18 U.S.C. § 2252A(a)(2)(A) (receipt or distribution of child pornography); 18 U.S.C. § 2252A(a)(5)(B) (possession of and access with intent to view child pornography); and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm/ammunition) are presently located at the **SUBJECT PREMISES**, more specifically described in Attachment A.

## STATUTORY AUTHORITY

4. As noted above, this investigation concerns alleged violations of several federal statutes:

a. 18 U.S.C. § 922(g)(1) prohibits a person who been previously convicted in any court of a crime punishable by imprisonment for a term exceeding one year to received or possess any firearm or ammunition which has been shipped or transported in interstate or foreign commerce, or to ship or transport such in interstate or foreign commerce.

b. 18 U.S.C. § 2252A(a)(1) prohibits knowingly mailing, transporting, or shipping child pornography in interstate or foreign commerce by any means, including by computer.

c. 18 U.S.C. § 2252A(a)(2) prohibits knowingly receiving or distributing any child pornography that has been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer.

d. 18 U.S.C. § 2252A(a)(5)(B) prohibits knowingly possessing, or accessing with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including

by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

**DEFINITIONS**

5. The following definitions apply to this Affidavit and Attachment B:

a. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

b. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c. "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

d. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

e. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units; internal and peripheral storage devices such as fixed disks; external hard drives; "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer; and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g. "Hyperlink," as used herein, refers to an item on a web page or in a mobile application which, when selected, transfers the user directly to another location in a hypertext document or to some other web page or (part of) a mobile application.

h. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

i. An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

j. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

k. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

l. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

m. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

n. A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks; RAM; "thumb," "jump," or "flash" drives; CD/DVDs; and other magnetic or optical media.

o. "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

p. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

**BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE**

6. On or about March 17, 2021, Yahoo (Oath Holdings) submitted CyberTipline Report ("CTR") 87734168 to the National Center for Missing and Exploited Children ("NCMEC") to report it had detected a user exchanging files of apparent child pornography with an individual operating a Gmail account. Yahoo identified its user's account as "vpturner1969@yahoo.com" and provided the user's verified phone number and recent IP log history. Yahoo also provided the images and affirmed it had viewed the entire contents of the uploaded file including EXIF data.

7. The several reported emails were exchanged between March 5-8, 2021. All of the images depicted prepubescent females (under the age of 12).

8. For an e-mail on March 7, 2021, at 15:09:56 UTC was sent by vpturner1969@yahoo.com to a G-Mail email account. This e-mail had a subject title of "Brunch." Yahoo provided e-mail header data for the e-mail however did not provide the IP address within the header details. This email had three picture file attachments. Yahoo provided the original file names for the three files attached.

a. Original File Name: 55d69dde7ee27ed08709d8a366028d98ximagejpeg. In report given file name 3.jpg – This is a picture of a prepubescent female who appears

under the age of five. She is wearing a light pink jacket and a darker pink shorts and panties. Her legs are apart, and her shorts and panties are to the side exposing her vaginal area.

b. Original File Name: gejwv6rd.jpg. In the report given file name 1.jpg – This is a picture file of two prepubescent females with swimsuits on sitting on a boat, one has her legs up somewhat exposing the area around her vaginal area.

c. Original File Name: sx1.jpg. In the report given file name 2.jpg – A picture of four prepubescent white females, three fully clothed and one nude from the waist down and her vaginal area is exposed. She appears to be under the age of six.

9. On or about March 26, 2021, Yahoo submitted a second report 88111206 to escalate its earlier report. According to Yahoo, it had independently reviewed other images in the account, and found an image of a Vernon Preston Turner's driver's license. Yahoo noted Vernon Turner was a convicted/registered sex offender, residing in Kingman, Kansas. Yahoo further advised that its review of IP log history showed the account had been most recently logged into from an IP address typically geolocated in or around Pratt, Kansas (which was consistent with the Kingman residence). Yahoo expressed advised the account had been terminated on March 8, 2021, which the child sexual exploitation material was detected.

10. These CyberTips were made available to the Kansas Internet Crimes Against Children Task Force, which assigned Det. Jennifer Wright to investigate.

11. Det. Wright initially determined Vernon Preston Turner (TURNER) had been previously convicted of a child pornography sex offense in North Carolina in 2001.

12. Det. Wright found TURNER was in jail in Kingman County for other charges. Contact with the Kingman County Sheriff confirmed TURNER had been in jail during the time of the exchanges reported by Yahoo, and should not have had access to the internet. The Kingman County Sheriff further advised TURNER had a brother who resided in Kingman. The "brother" was later identified as Tyren Presley, son of Gail Presley.

13. Det. Wright obtained a search warrant for the subscriber information for the IP address

(2600:8803:3800:8e00:dd7e:890f:f64:4709) used to log into the Yahoo account near in time to the exchange on March 7, 2021 at 15:02:52 UTC (roughly 8 minutes prior to the last reported email exchange) Det. Wright also obtained a search warrant for the "vpturner1969@yahoo.com" account.

14. Results for subscriber information returned to Gail Presley, with service at 434 West E Avenue, Kingman, Kansas (**SUBJECT PREMISES**). This address is over half a mile from the jail.

15. Results from the search warrant for the "vpturner1969@yahoo.com" indicated the account had been registered in 2010. The last password change was in October 2016. Review of the content confirmed Yahoo's report – that it had been used to trade child pornography – but only contained a limited number (13) of messages in the inbox, all of which were dated March 6 to March 8, 2021, indicating the account was being purged on a regular basis. A small number of older emails were found in folders (such as Car, 001, PayPal, Draft). There was no deleted folder provided, indicating the deleted folder had also been purged. A review of the IP history showed the account had been accessed repeatedly from the **SUBJECT PREMISES** and occasionally through a virtual private network (VPN) connection.

16. Det. Wright learned from the Kingman County Sheriff that Tyren Presley (PRESLEY) regularly comes and goes from **SUBJECT PREMISES.** Research into PRESLEY revealed he had been previously convicted of sexual exploitation of a child in Kentucky in 1999, and was subject to lifetime registration.

17. On January 19, 2022, Det. Wright interviewed Vernon TURNER at the Kingman County Jail regarding his account. TURNER advised he had not accessed the account as he had been in jail since late 2018. TURNER advised he and PRESLEY had spent time in prison together, and

they both knew not to use their own accounts. TURNER denied that PRESLEY knew his account password. TURNER advised PRESLEY knew to how to use and did make use of a VPN.

18. Following the interview, Det. Wright learned that TURNER immediately attempted to contact Tyren Presley by telephone. When TURNER was able to speak with PRESLEY, TURNER discussed the fact that he had given PRESLEY his account password. PRESLEY advised TURNER he didn't want to talk about it over the telephone.

19. Following the interview, Det. Wright learned from Capt. Sowers (Kingman County Sheriff's Office) that, according to a family member, PRESLEY historically (as of 2018) had a room at Gail Presley's **SUBJECT PREMISES** where he lived and kept computers. Capt. Sowers later provided contact information for family members of PRESLEY.

20. On January 27, 2022, Det. Wright spoke with Valdonna Rossilon and Randy Keene. Valdonna is a sister to PRESLEY. She advised that PRESLEY lives at Gail Presley's house (**SUBJECT PREMISES**) though he maintains a residence in Wichita. Valdonna advised that PRESLEY has computer equipment at the residence – she described seeing PRESLEY at a computer in his room approximately a month ago, and she recalled that she had seen the same computer at the residence several times over the previous year. Randy Keene reported seeing PRESLEY in his bedroom in the **SUBJECT PREMISES** using a laptop. Randy advised he could see a picture of a 3-4 year old Asian female in a blue dress. Both Valdonna and Randy advised there are no Asian children in the family.

21. Valdonna reported she previously asked PRESLEY about guns she had seen in the **SUBJECT PREMISES**. According to Valdonna, PRESLEY advised her that he had Gail purchase the guns for him. Valdonna advised that the guns were located in a safe in Gail's room, but that PRESLEY had a key to the safe.

22. Valdonna also reported that, when TURNER had been arrested in 2018 for a sex offense involving the production of child pornography, PRESLEY had gone to TURNER's residence and removed cameras and computer equipment before law enforcement arrived. She reported PRESLEY placed those in storage, but he had since moved them to the **SUBJECT PREMISES** in a trailer, which was parked in front of the garage.

23. Valdonna advised PRESLEY and Gail are currently out of state, and she is taking care of the house. Valdonna reported that, on her recent visit, she observed the guns along with boxes of ammunition are presently located at the **SUBJECT PREMISES**. Valdonna also reported PRESLEY's room is locked, and the trailer is still present. (Law enforcement has confirmed the trailer is presently parked in the stall next to the house, as shown in the picture in Attachment A.)

24. Research into PRESLEY indicates he was convicted of violations of 18 U.S.C. § 2251(a), Sexual Exploitation of Children (Production) and 18 U.S.C. § 2241(c), Aggravated Sexual Abuse with a Child who has not Attained the Age of 12 Years, in Western District of Kentucky case 99-CR-25. He was sentenced to 151 months in the Bureau of Prisons.

**BACKGROUND ON CHILD PORNOGRAPHY,
COMPUTERS, AND THE INTERNET**

25. Based on your affiant's experience in the investigation of computer-related crimes and the discussions your affiant has had with other investigators who have experience in investigations related to child exploitation, your affiant knows the following:

a. Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b. Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone

may be stored on a removable memory card in the camera or smartphone, or transferred to external storage devices, such as a USBC. These memory cards and USBC devices are often large enough to store thousands of high-resolution photographs or videos.

c. A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f. Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g. A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

h. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

26. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who access online child sexual abuse and exploitation material via a website or via file-sharing:

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Such individuals almost always possess and maintain child pornographic material in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain those materials and child erotica for many years.

d. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to

download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[1]

f. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information (e.g. online messaging accounts, email addresses, etc.) of individuals with whom they have been in contact and who share the same interests in child pornography.

g. Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h. Even if the target uses a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in the target's home, the **SUBJECT PREMISES**, as set forth in Attachment A, including on digital devices other than the portable device (for reasons including the frequency of "backing up" or "syncing" mobile phones to computers or other digital devices).

27. Based on all of the information contained herein, I believe that an Internet user residing at the **SUBJECT PREMISES** displays characteristics common to individuals who access online child sexual abuse and exploitation material via a website. In particular, the target of investigation has used a computer to establish contact with another offender to exchange child pornography.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

28. Based on your affiant's experience in the investigation of computer-related crimes and the discussions your affiant has had with other investigators who have experience in investigations related to child exploitation, your affiant knows there are certain characteristics common to individuals who advertise, distribute, receive, possess, and/or access with intent to view child pornography:

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain their pictures, films, video tapes, photographs, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, and child erotica, etc. for many years.

d. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment. These collections may exist on the individual's current as well as older cell phones, computers and tablets. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence

of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[2]

f. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses (including email addresses), and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

g. Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h. Even if the **SUBJECT** uses a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in his home, the **SUBJECT PREMISES**, as set forth in Attachment A, including on digital devices other than the portable device (for reasons including the frequency of "backing up" or "synching" mobile phones and other digital devices).

29. In this investigation, the user of the reported account has gained apparent access to child pornography, and has found at least one other like-minded individual with whom correspondence and images have been shared. It appears the user shares many of the characteristics of child pornographers. Additionally, it appears the owner/operator of the account, Vernon Turner, has provided access to his account to Tyren Presley, both of whom have a documented historic interest in child exploitation. Irrespective of whether Presley was using the Yahoo account, his involvement in child exploitation and his presence at the **SUBJECT PREMISES** make it more likely that evidence associated with the aforementioned crimes will be found at the **SUBJECT PREMISES**.

---

[2] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

**SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS**

30. As described above and in Attachment B, this application seeks permission to search for records that might be found in the **SUBJECT PREMISES**, in whatever form they are found. One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

31. Your Affiant submits that if a computer or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

a. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

32. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information

incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

33. Based upon your affiant's training and experience, and information relayed to your affiant by agents and others involved in the forensic examination of computers, your affiant knows that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. Your affiant also knows that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into

readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

34. Additionally, based upon your affiant's training and experience and information relayed to your affiant by agents and others involved in the forensic examination of computers, your affiant knows that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, your affiant knows that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

35. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might

expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

36. Your affiant submits that this affidavit supports probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in **Attachment B**, are located in or at the location described in **Attachment A**. I respectfully request that this Court issue a search warrant for the location described in **Attachment A**, authorizing the seizure and search of the items described in **Attachment B**.

37. Your affiant is aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Respectfully submitted,

Travis Putrah, Special Agent
Homeland Security Investigation

Sworn to and subscribed before me on this 28th day of January, 2022.

The Honorable Gwynne E. Birzer
United States Magistrate Judge

## ATTACHMENT A

### THE LOCATION TO BE SEARCHED

This warrant authorizes the search of the PREMISES AND DEVICES located at:

**434 West E Avenue, Kingman, Kansas**

The property is further described as a single family residence located at 434 W E Avenue Kingman, Kansas. The residence is the second structure east of the intersection of W E Avenue and Lincoln Street. The residence has yellow vinyl siding with brown trim. The front door faces south and the number 4-3-4 are white in color located on the brown trim on the porch just above the front door. There is a white trailer parked under the car port that is attached to the residence located on the east side of the residence. A photo of the SUBJECT PREMISES appears below:



**SEARCH TO INCLUDE:** All areas of the **SUBJECT PREMISES** to including living areas, dining areas, kitchens, bathrooms, closets, bedrooms, storage closets, garages, containers, and areas of the surrounding grounds including trash cans and detached sheds or garages, and specifically including the trailer located in front of the garage.

**THE FOLLOWING CONTAINER(S):** Any combination safe, locked box, or other container that may contain any of the items sought. If officers are unable to open or access these containers, the officers are allowed to remove and retain them until they can be opened or accessed.

# ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

1. Any and all child pornography (as defined in 18 U.S.C. § 2256(8)), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), in any format or medium, including computer files, prints, negatives, drawings, and paintings.

2. Any and all child erotica, in any format or medium, including documents, writings, and images or videos of children that do not qualify as child pornography but evince a sexual interest in children.

3. Any and all documents, records, or correspondence, in any format or medium, pertaining to operation of the Google and Yahoo accounts described in the attached affidavit and reported in the referenced Cybertips (known to law enforcement).

4. Any and all computer devices (including desktops, laptops, tablets, smartphones, as well as the hardware, peripherals, software, computer related documentation, passwords and data security devices, and storage devices), including the software or programs or applications contained therein, that may be or are used to:

   a. produce, distribute, receive, possess or access child pornography or visual depictions of minors engaged in sexually explicit conduct;

   b. seek, obtain, store, or record information pertaining to the sexual exploitation of children or otherwise relate to an interest in child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children; and

c. communicate with any other person regarding child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children.

5. Any and all computer devices (including desktops, laptops, tablets, smartphones, as well as the hardware, peripherals, software, computer related documentation, passwords and data security devices, and storage devices), including the data or information on the device, which may reveal indicia of ownership, access, or use of the account and websites described in the attached affidavit.

6. Any and all notes, documents, records, correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, diaries, manifestos, manuals, email messages, chat logs and electronic messages, and handwritten notes) pertaining to child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children, and to include any and all data or records that may reveal indicia of creation, use, or ownership of the notes, documents, records, or correspondence.

7. Any and all cameras, film, videotapes or other photographic equipment, which may be used to contain, create or duplicate child pornography, visual depictions of minors engaged in sexually explicit conduct, or child erotica.

8. Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the **SUBJECT PREMISES** described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

9. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

10. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

11. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern encryption, deletion, or destruction of evidence.

12. Any and all visual depictions of minors that may assist in the identification of minors depicted in images of child erotica or child pornography.

13. Any and all firearms and ammunition.

14. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, pictures, videos, and other digital data files), pertaining to ownership or possession or operation of the firearms and ammunition.